United States v. Westchester County, New York

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: December 12, 2012                    Decided: April 5, 2013)

Docket No. 12-2047-cv

_____

UNITED STATES OF AMERICA ex rel.
ANTI-DISCRIMINATION CENTER OF
METRO NEW YORK, INC.,

*Plaintiff-Appellee*,

v.

WESTCHESTER COUNTY, NEW YORK,

*Defendant-Appellant*.[*]

_____

Before: POOLER, HALL, and CHIN, *Circuit Judges*.

Westchester County ("the County") appeals from a judgment of the United States District

Court for the Southern District of New York (Denise Cote, *J.*) finding the County in violation of

the duty to promote source-of-income legislation under a consent decree entered into to resolve a

*qui tam* action brought by relator, the Anti-Discrimination Center of Metro New York, Inc.,

under the False Claims Act for the submission of false claims by the County to the United States

Department of Housing and Urban Development in order to obtain federal grant monies for fair

housing.  We hold that the district court had jurisdiction to review the decision of the reviewing

_____

[*] The Clerk of the Court is directed to amend the caption as set out above.

magistrate judge under the consent decree. We also hold that the County violated the terms of the consent decree.

Affirmed.

_____

ROBERT F. MEEHAN, Westchester County Attorney (Linda M. Trentacoste, Associate County Attorney, Adam Rodriguez, Senior Assistant County Attorney, Justin R. Adin, Assistant County Attorney, *on the brief*), White Plains, NY, *for Defendant-Appellant*.

DAVID J. KENNEDY, Assistant United States Attorney, Southern District of New York (Preet Bharara, United States Attorney, Sarah S. Normand, Benjamin H. Torrance, Assistant United States Attorneys, *on the brief*), New York, NY, *for Plaintiff-Appellee*.

Martin Sander Kaufman, Atlantic Legal Foundation, Larchmont, NY, *for Amicus Curiae Building & Realty Institute of Westchester County, in support of Defendant-Appellant*.

POOLER, *Circuit Judge*:

Westchester County ("the County") appeals from a judgment of the United States District Court for the Southern District of New York (Denise Cote, *J.*) finding the County in violation of its duty to promote source-of-income legislation under a Stipulation and Order of Settlement and Dismissal ("consent decree") entered into by the County with the United States to resolve a *qui tam* action initially brought by relator, the Anti-Discrimination Center of Metro New York, Inc. ("ADC"), under the False Claims Act alleging the submission of false claims by the County to the United States Department of Housing and Urban Development ("HUD") in order to obtain federal grant monies for fair housing. We hold that the district court indeed had jurisdiction to review the decision of the reviewing magistrate judge under the consent decree. We further hold that the County violated the terms of the consent decree.

2

**BACKGROUND**

**I.**

In April 2006, the ADC brought a *qui tam* action against the County under the False Claims Act, 31 U.S.C. §§ 3729-33. The action charged that from 2000 through 2006, the County submitted false claims to HUD in order to obtain millions of dollars in funds that were required, under 42 U.S.C. § 5304(b)(2), to be used to "affirmatively further fair housing." HUD regulations require grantees, as part of the requirement to affirmatively further fair housing, to consider the existence and impact of racial discrimination in analyzing the barriers to housing opportunities in their areas as a condition to receive these federal funds. *See* 24 C.F.R. §§ 91.425, 570.601; 1 Office of Fair Hous. & Equal Opportunity, U.S. Dep't of Hous. & Urban Dev., Fair Housing Planning Guide 2-7 to -8; 2-16 to -17 (1996), *available at* www.hud.gov/offices/fheo/images/fhpg.pdf; *see also* Exec. Order No. 11,063, 27 Fed. Reg. 11,527 (Nov. 20, 1962). The ADC contended that the County failed to comply with HUD regulations but nonetheless certified its compliance with the grant requirements. In initial proceedings before the district court, the court ruled that the County was obligated to consider race in connection with its certification to HUD, *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.*, 495 F. Supp. 2d 375, 376 (S.D.N.Y. 2007), and that the County's certifications to HUD were false as a matter of law, *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.*, 668 F. Supp. 2d 548, 562-65 (S.D.N.Y. 2009).

In August 2009, the United States intervened and, on the same day, presented the Court with a consent decree to which all the parties had agreed. The consent decree obligated the

County to pay $30 million to the United States, $21.6 million of which would be credited to the County's HUD account to fund fair housing, and pay $2.5 million to the ADC as relator. The County also made various commitments to affirmatively further fair housing and to eliminate discrimination in housing opportunities. The County's exposure under the False Claims Act would have been $156 million—treble damages based on $52 million in false claims. *See* 31 U.S.C. § 3729(a)(1). In order to ensure compliance with the consent decree, the district court appointed James E. Johnson of Debevoise & Plimpton to serve as Monitor, authorized to oversee the steps taken by the County to affirmatively further fair housing as contemplated by the consent decree. The Monitor was charged with reviewing the County's actions, recommending additional actions needed to ensure compliance, and to resolve disputes between the United States and the County. The dispute resolution provision of the consent decree reads:

> Within ten (10) business days of receipt of the Monitor's report and recommendation, the County or the Government may seek additional review from the magistrate judge assigned to this case; otherwise, the Monitor's resolution shall be final, binding and non-appealable. Should the County or the Government seek such additional review from the assigned magistrate judge, the relevant provisions of the Federal Rules of Civil Procedure, the Local Rules and the Court's Individual Rules governing reports and recommendations from a magistrate judge shall apply.

As part of the County's obligation to affirmatively further fair housing, the County agreed to, among other things, "promote, through the County Executive, legislation currently before the Board of Legislators to ban 'source-of-income' discrimination in housing." Source-of-income legislation bans housing discrimination based upon an individual's source of income, primarily whether an individual's lawful income comes in the form of Social Security benefits or any form of state or federal public assistance, including Section 8 vouchers.

4

In 2009, as recognized by the consent decree, the County Board of Legislators was considering the passage of source-of-income legislation. Following the County's commitment to the consent decree, the County Executive at the time, Andrew Spano, sent five brief letters to advocacy organizations expressing his hope that they would continue the work in which they were already engaged in advocating for the legislation. Spano also sent a letter to the leadership of the Board of Legislators encouraging enactment of the legislation. The legislation was not approved by the Board by the end of the 2009 legislative session, but it was reintroduced in 2010 in a form identical to the legislation pending when the consent decree was ratified at the Board of Legislators. The Board passed the source-of-income legislation in June 2010. The version passed by the Board contained three alterations made throughout the legislative process that rendered the passed legislation less protective against source-of-income discrimination than the initial version had been: It (1) removed "court-ordered payments" and "inheritance, annuities, pensions, and child and spousal support" from the definition of source of income, (2) set a monetary penalty of $50,000 for wanton, willful or malicious discrimination, while previous versions set the penalty at $50,000 for discrimination and $100,000 for wanton, willful or malicious discrimination, and (3) exempted cooperative apartments and condominiums. It is undisputed that, at the reintroduction of the legislation in January 2010, newly elected County Executive Robert Astorino took no steps to promote the legislation and subsequently vetoed the amended version on June 25, 2010.

Per the consent decree, on July 11, 2011, the County submitted its revised Analysis of Impediments ("AI") plan to HUD. By letter dated July 13, 2011, HUD notified the County that the AI did not meet the requirements of the consent decree because it did not incorporate the

5

corrective actions that HUD had earlier specified, including "promotion of source-of-income legislation or plans to overcome exclusionary zoning practices." HUD thus rejected the County's certification that it would affirmatively further fair housing and its Fiscal Year 2011 Action Plan ("FY2011 Plan"). Once the FY2011 Plan was rejected, the County was removed as a grantee eligible for HUD funds, and thus their federal funding was discontinued. In response to this rejection and the cut-off of federal funding, the County sought review by the Monitor on July 20, 2011. On August 18, 2011, the United States also sought review of several disputes from the Monitor, including the claim that County Executive Astorino's veto of the source-of-income legislation breached the consent decree. The other disputes addressed by the Monitor and the lower courts at that time are not at issue in the current appeal.

On November 17, 2011, the Monitor issued his amended report which found, among other things, that "the County is in breach of its obligation to promote certain 'Source of Income' legislation" and concluded that, under the consent decree, "promote" included an obligation to "help bring [such legislation] into being." On December 7, 2011, the County objected to the Monitor's determination and sought review from the Magistrate Judge. The Magistrate Judge, in a March 16, 2012 opinion and order, sustained the County's objection on the dispute over source-of-income legislation. In response to this decision, the United States filed an objection with the district court seeking review of the portion of the Magistrate Judge's opinion concluding that the County did not violate its duty to promote source-of-income legislation.

## II.

Before the district court, the County argued that, based upon the terms of the consent decree, the court was without jurisdiction to review the Magistrate Judge's opinion and order.

6

Further, the County argued that the Magistrate Judge's decision had been correct and that an alternate reading of the consent decree's duty to promote would violate the federal Constitution. As an initial matter, the district court addressed the County's jurisdictional argument, finding that, under the terms of the consent decree, it did indeed have authority to review the Magistrate's determination. *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.*, 06 Civ. 2860, 2012 WL 1574819, at \*4 (S.D.N.Y. May 3, 2012). On the merits, the district court reversed the Magistrate Judge's decision regarding the County's obligation with respect to the source-of-income legislation and affirmed the Monitor's initial decision that the County was in breach of its duty to promote that legislation. *Id.* at \*5-9. The County now appeals.

## DISCUSSION

Interpretation of a consent decree is an issue of law that this Court reviews de novo. *Davis v. N.Y.C. Hous. Auth.*, 278 F.3d 64, 79 (2d Cir. 2002). Similarly, we review jurisdictional questions de novo. *See, e.g.*, *Velez v. Sanchez*, 693 F.3d 308, 314 (2d Cir. 2012). The propriety of relief granted for violations of a consent decree is reviewed for abuse of discretion. *Davis*, 278 F.3d at 79. "And 'though a court cannot randomly expand or contract the terms agreed upon in a consent decree, judicial discretion in flexing its supervisory and enforcement muscles is broad.'" *Id.* at 80 (quoting *EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*, 925 F.2d 588, 593 (2d Cir. 1991)).

Consent decrees "reflect a contract between the parties (as well as a judicial pronouncement), and ordinary rules of contract interpretation are generally applicable." *Doe v. Pataki*, 481 F.3d 69, 75 (2d Cir. 2007). This requires that "'deference . . . be paid to the plain

7

meaning of the language of a decree and the normal usage of the terms selected.'" *United States v. Broad. Music, Inc.*, 275 F.3d 168, 175 (2d Cir. 2001) (quoting *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985)).  The rules of contract interpretation, however, do not contemplate considering any provision of the contract in isolation "but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) (citation and internal quotation marks omitted).

## I.

We first look to the terms of the consent decree to determine if the district court had jurisdiction to review the decision of the Magistrate Judge.  Under the terms of the consent decree, the district court retains jurisdiction over both enforcement and interpretation:

> Notwithstanding any other provisions of this Stipulation and Order, this Court shall retain exclusive jurisdiction over this Stipulation and Order, including, but not limited to, any application to enforce or interpret its provisions, and over each party to the extent its obligations herein remain unsatisfied.

The County urges this Court to read the provision of the consent decree that contemplates review of decisions of the Monitor to divest the district court of its reserved jurisdiction.  This provision of the consent decree reads:

> the County or the Government may seek additional review from the magistrate judge assigned to this case; otherwise, the Monitor's resolution shall be final, binding and non-appealable. Should the County or the Government seek such additional review from the assigned magistrate judge, the relevant provisions of the Federal Rules of Civil Procedure, the Local Rules and the Court's Individual Rules governing reports and recommendations from a magistrate judge shall apply.

In addition to the fact that the agreement reserves jurisdiction in the district court "[n]otwithstanding any other provisions" of the consent decree, the section concerning review of the Monitor's decisions cannot be read in the way the County urges.  Contrary to the County's

8

arguments, this provision does not invoke the jurisdiction of 28 U.S.C. § 636(c), whereby parties can agree to submit to the jurisdiction of a Magistrate Judge and authorize him or her to make binding decisions, and instead clearly invokes "the relevant provisions of the Federal Rules of Civil Procedure, the Local Rules and the Court's Individual Rules governing reports and recommendations from a magistrate judge." Once the County chose to seek review from the Magistrate Judge, it also consented to the application of the rules that govern all magistrate reports and recommendations. Federal Rule of Civil Procedure 72 expressly governs this scenario. Far from making the decision of a magistrate final, that Rule specifically states that the "district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). It is plain from the face of the consent decree that the district court did indeed have jurisdiction to review the decision of the Magistrate Judge once it had been properly objected to by one of the parties—in this case, the United States. As we have determined that the district court had jurisdiction below, we now turn to the merits of this appeal.

## II.

At issue here is whether the County has breached the consent decree's requirement, laid out in paragraph 33(g), that it "promote, through the County Executive, legislation currently before the Board of Legislators to ban 'source-of-income' discrimination in housing."

## A.

This Court has recently observed that "[t]he ordinary meaning of 'promote' includes 'to bring or help bring into being,' to 'contribute to the growth, enlargement, or prosperity of,' or to 'encourage' or 'further.'" *United States v. Awan*, 607 F.3d 306, 314 (2d Cir. 2010) (citation

9

omitted).  The plain meaning of the word "promote" naturally remains the same here.  Thus, in entering into the consent decree, the County agreed to help bring the source-of-income legislation into being through the County Executive.  While such a duty certainly does not require the County Executive to ensure that the legislation be enacted into law, *cf. United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 821 (1984), promotion requires affirmative action by the obligated party to help bring the object in question into being.  While promotion does not require insurance, promotion is also not met by taking no action or taking an action that detracts from, rather than furthers, the end goal.  The fact that the County Executive does not fulfill the duty to promote if he takes no action or takes affirmative steps to detract from the passage of this legislation does not convert the duty to promote into a duty to ensure.  For example, if the Board never passed the legislation, but the County Executive undertook numerous active steps trying to bring the legislation into being, the duty to promote could be discharged even while the passage would not have been ensured.

Despite the requirement imposed by the word promote, the County, relying on *Suter v. Artist M.*, 503 U.S. 347 (1992), would have us conclude that the obligation contemplated in this provision of the consent decree is unclear in what it requires and is thus intended to be merely hortatory.  *Suter* actually holds the converse—that where language was intended to be hortatory, it could not be said to provide unambiguous notice of what was required.  *Id.* at 356.  To rely on the logic of *Suter*, this Court need first consider whether the language at issue is hortatory.  In the instant case, the plain language of the agreement belies any claim that the duty to promote was merely hortatory.  Rather, the duty to promote is one of a series of enumerated duties that the County "shall" undertake, and thus *Suter* does not provide grounds upon which the County could somehow be relieved of this duty.

10

The County also insists that because other obligations taken on by the County in this section of the consent decree used terms such as "adopt" or "amend," paragraph 33(g) does not actually impose a particular duty upon the County Executive. The mere fact that other parts of this section of the consent decree used different verbs to describe other obligations does not change the clear meaning of the duty to promote. By its express terms, paragraph 33(g) contemplates a duty of the County to be carried out through the County Executive. As the County has repeatedly noted throughout this litigation, the passage of legislation takes both a majority vote from the Board and signing by the County Executive. A duty to adopt or amend could not apply where the County Executive is the operative party because the County Executive could not force the Board to pass the given legislation. Imposing a duty to "adopt" instead of a duty to "promote" on the County Executive would be attempting to bind the Executive to do something not solely within his power. As written, the provision places an affirmative duty on the County Executive, one that requires him to help bring the source-of-income legislation into being. Furthermore, the fact that this paragraph is not styled as the duty of the County Executive to sign passed legislation does not undermine the plain reading that there is an affirmative duty imposed upon the County Executive. Namely, the duty to promote is actually broader than a duty merely to sign a legislative enactment once passed by the Board. The duty to promote imposes affirmative duties on the Executive even before legislative enactment, whereas a duty simply to sign would only impose a duty on the Executive after the Board had passed the legislation in question. Thus, we hold that the plain language of the consent decree imposes a duty on the County, through the County Executive, to help bring the source-of-income legislation into being.

11

**B.**

Having determined what constitutes promotion, we next consider whether the obligation under paragraph 33(g) was a continuing one, as the United States urges and the district court found, or if it was extinguished with the close of the 2009 legislative session, as argued by the County. Paragraph 33(g) calls for the County Executive to promote "legislation currently before the Board of Legislators to ban 'source-of-income' discrimination in housing." The use of "currently" in this sentence is most naturally read as a descriptor of the legislation in question, providing great detail as to what legislation would be required in a few words by making reference to potential legislation being considered by the Board at the time the consent decree was entered. The County urges this provision be read as creating a time period in which the duty to promote would have existed—namely, what would have amounted to less than five months: from the time of the August 2009 entry into the agreement to the end of the legislative session in December 2009. The terms of the agreement do not support this reading. Language that would have limited the duty to the scant five months left in the 2009 legislative session would have either (1) explicitly set a time limitation or (2) read something like "promote before the current Board of Legislators . . . ." The consent decree does neither of these things.[1] Rather, this provision is best read to attach the duty to promote to source-of-income legislation of the kind

---

[1] The County also argues that because paragraph 33(g) refers to "*the* County Executive," its obligation only enured to Andrew Spano, who was County Executive when the agreement was signed in 2009. The use of the definite article in this provision simply cannot bear the weight that the County attempts to assign to it. At any given time there is only one County Executive, so it is only natural that this office would be referred to with the definite article. If the consent decree contemplated only binding Spano and not any future holder of the office of County Executive, it would have either (1) identified Spano by name or (2) said "the current County Executive." The County's argument attributing such significance to the use of the definite article is unsupportable.

12

pending before the Board at the entry of the consent decree. Elsewhere in the consent decree, the parties demonstrate that they clearly knew how to establish a temporal obligation if one was intended and to provide mechanisms for the County to apply for the extension of such deadlines, lending further support to interpreting the provisions that lack such deadlines as imposing continuing obligations upon the County.

It is ordinary practice that when a bill is not passed by a legislature during one session, it is introduced again in the next legislative session, which indeed is what occurred in this case. The exact same legislation that was pending at the time of the entry of the consent decree was reintroduced at the start of the Board's 2010 legislative session. Because the duty to promote did not expire with the end of the 2009 legislative session, the County Executive had a continuing duty to promote this legislation that was reintroduced in January 2010.

**C.**

Having concluded that the duty to promote requires the County Executive to help bring the legislation into being and that it was not temporally limited to the 2009 legislative session, the final question at issue is whether the County breached this duty. The total sum of action taken by the County, through two successive County Executives, in relationship to the source-of-income legislation amounted to: (1) a single letter to the Board of Supervisors from County Executive Spano in October 2009; (2) five identical letters to community organizations from Spano in November 2009, thanking them for their work and stating, "I hope you will continue your advocacy and efforts in reaching out to members of the Board of Legislators," in an effort perhaps best characterized as preaching to the choir; and (3) County Executive Astorino's June 25, 2010 veto of the source-of-income legislation passed by the Board. While the first two

13

actions do constitute promotion, the veto was wholly inconsistent with the County Executive's duty to promote. Moreover, because the three aforementioned actions were the sum total of what the County Executive did with respect to the legislation, and no affirmative steps had been taken to promote the legislation since the November 2009 letters to the advocacy organizations, we hold that the County breached its duty to promote under the consent decree.

## III.

The County further argues that because the County Executive and members of the Board are subject to term limits, they cannot bind their successors to the obligations of the consent decree—a proposition that, if accepted, would terminate all of the obligations under the consent decree at the close of the terms of office during which the agreement was entered. Such a conclusion would amount to a sea change in the operation of consent decrees in the United States. Elected officials, when entering into such agreements, are serving as representatives of their unit of governance. And this Court has had no difficulty concluding that a consent decree is binding on successor public officials: "[a]lthough the individual defendants named in the caption no longer serve . . . , no one disputes that the consent decree remains binding on their successors." *Barcia v. Sitkin*, 367 F.3d 87, 90 n.1 (2d Cir. 2004). The Third Circuit has been even more explicit that "the election of a new administration does not relieve [a local government] of valid obligations assumed by previous administrations." *Harris v. City of Phila.*, 47 F.3d 1311, 1327 (3d Cir. 1995). Just as the County "would not have been free to break its contract with a vendor or other contractor because of the election of a new administration," so too the election of new officeholders, even into term-limited offices, does not permit the County "to unilaterally default on its obligations to the court and other litigants." *Id.* We now explicitly

14

hold what we implied in *Barcia*: a local government is not relieved of its obligations under a consent decree taken on by a previous administration merely because new local officials will and do take office.

Virtually all of the terms of the consent decree require future and continuing action by the County government. While it is true that in New York, the "term limits rule prohibits one municipal body from contractually binding its successors in *areas relating to governance* unless specifically authorized by statute or charter provisions to do so," *Karedes v. Colella*, 100 N.Y.2d 45, 50 (2003) (emphasis added), that rule is inapposite to the case at hand. The cases construing the term limits rule all deal with the actual *structure* of governance and not with a duty to undertake a substantive action in accordance with a consent decree. *See Morin v. Foster*, 45 N.Y.2d 287, 293 (1978) (county legislature could not amend charter to allow county manager to be removed at will); *City of Utica Urban Renewal Agency v. Doyle*, 66 A.D.3d 1495, 1496 (N.Y. App. Div. 2009) (public officials and agency appointees could not enter into agreement extending term of agency executive director); *Hampton Heights Dev. Corp. v. Bd. of Water Supply*, 140 A.D.2d 958, 958 (N.Y. App. Div. 1988) (mayor serving four-year term could not appoint water board member serving five-year term). These cases illustrate that "governance" does not include each and every action taken by an elected official, but rather refers to the actual structuring of the local government and not the enactment of any legislation or the promotion of such legislation. Thus, the argument that the term limits rule in New York prevents the County from entering into the consent decree fails. Further, the cases cited by the County to the contrary—*Perkins v. City of Chi. Heights*, 47 F.3d 212 (7th Cir. 1995), and *Overton v. City of Austin*, 748 F.2d 941 (5th Cir. 1984)—are inapposite on this same ground. Both of these cases

15

deal with the restructuring of the local government, changing elections systems from at-large to single-member districts. In addition to the fact that these precedents would not bind this Circuit in any event, they remain inapplicable where the structure of governance has not been altered. Here, the County entered into the consent decree, agreeing that the County Executive would promote the source-of-income legislation. Requiring action on one piece of legislation does not alter the structure of County governance, as occurred in each of the cases cited by the County. We thus hold that the County did have the authority to enter into the consent decree and that the consent decree continues to bind successive elected County officials.

We also note that for the County to now claim that it was without power to do what it expressly represented was in its power as it sought to avoid hundreds of millions of dollars in liability is all the more problematic. In entering into the consent decree, the County chose to bind itself to these terms "rather than have the District Court adjudicate the merits." *Badgley v. Santacroce*, 800 F.2d 33, 38 (2d Cir. 1986). "The strong policy encouraging settlement of cases requires that the terms of a consent judgment, once approved by a federal court, be respected as fully as a judgment entered after trial." *Id.* Such an agreement constitutes "a fully enforceable federal judgment that overrides any conflicting state law or state court order." *Id.*

**IV.**

Finally, the County urges this Court to reject the lower court's interpretation of the consent decree as untenable under two constitutional doctrines and a provision of the Constitution: (1) "the canon of contract construction that surrenders of sovereign authority must appear in unmistakable terms," *United States v. Winstar Corp.*, 518 U.S. 839, 860 (1996), (2) "the doctrine that a government may not . . . contract to surrender certain reserved powers," *id.*,

16

and (3) the Guaranty Clause, U.S. Const. art. IV. § 4. Turning to each of these below, we conclude that none alters our interpretation of the consent decree.

**A.**

The County argues that the unmistakability doctrine prevents the current interpretation of the consent decree because the agreement did not surrender a sovereign power of the County Executive in unambiguous terms. This doctrine is a rule of contract construction that provides that in a contract with a sovereign government, "an ambiguous term of a grant or contract [will not] be construed as a conveyance or surrender of sovereign power." *Winstar*, 518 U.S. at 878. The unmistakability doctrine prevents governments from being bound to contracts notwithstanding subsequent changes in the law, unless the government consented to be bound in clear and unmistakable terms in the contract. *Id*. at 872. The County's reliance on this doctrine is flawed for two reasons. First, it strains, almost to the point of breaking, any reasonable definition of the word "promote" to contend that it could include a legislative veto. The County's commitment to help bring the source-of-income legislation into being was expressed in the consent decree in unmistakable terms. Second, even accepting, for purposes of this discussion, the County's argument that the duty to promote was unclear, the unmistakability doctrine still does not compel its preferred outcome. In the instant case, there is no subsequent change in the law that bears at all upon the County's obligations in the consent decree. Rather, in this case, the consent decree contemplates future promotion and possible passage of one piece of legislation. This is not an instance where the County would be prevented from undertaking "sovereign acts, needful for the public good," because doing so would "incidentally disable" it from performing the act promised in the consent decree. *Id*. at 921. Here, the County agreed to

17

promote one particular piece of legislation; it has not been "incidentally disabled" from any sovereign act. The unmistakability doctrine does not allow governments to undertake actions that are *specifically* aimed at voiding a contract or preventing performance of a contract. *See id.* at 878 n.22 (sovereign power is that which "could *otherwise* affect the Government's obligation under the contract"). A government cannot "abrogate one of its contracts by a statute abrogating the legal enforceability of that contract, Government contracts of a class including that one, or simply all Government contracts." *Id.* The County's attempted invocation of the unmistakability doctrine would do just that if accepted here. Thus we conclude that the unmistakability doctrine does not apply to the interpretation of the consent decree at issue here because (1) the obligation at issue is not ambiguous, and (2) the County is not "*incidentally* disabled" from undertaking any sovereign acts; rather, the County *expressly* agreed to action related to a single piece of legislation.

**B.**

The County next moves to invoke the "reserved powers" doctrine to avoid the plain interpretation of the duty to promote under the consent decree. The "reserved powers" doctrine holds that "a state government may not contract away 'an essential attribute of its sovereignty.'" *Id.* at 888 (citation omitted). Sovereign powers include, for example, the police power and the power of eminent domain. *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23-24 (1977). The County asserts that an interpretation of the consent decree that would require passage of the source-of-income legislation strips the County Executive of "an essential attribute of its sovereignty," as it implicates the police power. The singular exercise (or not) of a veto, however, is not essential to the Executive's "sovereignty," akin to the police power. The

18

agreement does not alter the structure of County governance writ large, nor does it prevent the County Executive from exercising his standard powers.[2]

As the Court has noted, "a State is without power to enter into binding contracts not to exercise its police power in the future." *Id.* at 23 n.20. However, as indicated above, the consent decree does not prevent any exercise of the County's police power. The County conclusorily asserts that vetoing legislation implicates the police power, without demonstrating any connection between a veto of the source-of-income legislation and the police power, and further appears to miss the fact that the consent decree does not create some general change in the power of the County Executive to veto legislation, which perhaps could be viewed as altering his sovereign powers, but is merely a substantive commitment to one piece of legislation. Moreover, the County retains the power to veto even this source-of-income legislation. By agreeing to such promotion in the consent decree, the County did not disable itself from taking contrary action with respect to the legislation. Rather, the County allocated the risk of breach to itself by entering into the consent decree. The County Executive remains free to veto the legislation, but if he does so, the County will be in breach of the consent decree and must live with the consequences of that choice. The County is not disabled from exercising "an essential attribute of its sovereignty." *Winstar*, 518 U.S. at 888. Moreover, as noted by the district court, this municipal veto is not an essential part of the police powers of the County, but rather "a

---

[2] We also note that a contract does not actually compel the actions agreed upon. Rather, if a contracting party chooses to act contrary to that which he has agreed, he will simply be in breach and be subject to the consequences of that breach. It is this unremarkable proposition to which the lower court was referring when noting that the County Executive had not been stripped of his veto power even in this one instance. *Westchester Cnty.*, 2012 WL 1574819, at *10 n.7.

prerogative of the County Executive within Westchester's system of governance, established by local code." *Westchester Cnty.*, 2012 WL 1574819, at \*10 (citing Westchester County, N.Y. Code, § 110.11 (11)). An agreement to help bring a single piece of legislation into being does not implicate an essential attribute of sovereignty because the agreement is in reference to the substance of the matter before it, namely, housing discrimination, and does not intrude upon the general powers and prerogatives of the County Executive or the County government.

## C.

As its final constitutional salvo, the County argues that the instant interpretation of the consent decree violates the Constitution's Guaranty Clause. U.S. Const. art IV, § 4. As this and other courts have repeatedly noted, such determinations are nonjusticiable political questions. *Colegrove v. Green*, 328 U.S. 549, 556 (1946) (holding that a "[v]iolation of the great guaranty of a republican form of government in States cannot be challenged in the courts"); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996). While we have recognized that "*perhaps* not all claims under the Guarantee Clause present nonjusticiable political questions," just as in *Padavan*, "there is no basis for us to say that the [County] here ha[s] presented a justiciable claim." *Id.* (emphasis added) (citation and internal quotation marks omitted). Furthermore, even if we determined the question here was justiciable, the County has not presented any evidence that it has been deprived of a republican form of government. The residents of the County remain able to "choose their own officers" and "pass their own laws," Appellant's Br. at 43, and they chose their own officers—ones that decided to enter into the current consent decree rather than open up the County to $156 million in damages liability.

20

**D.**

Finally, we note that the concerns identified in *Horne v. Flores*, 557 U.S. 433, 448 (2009), and *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441-42 (2004), are real ones, and federal courts should carefully consider the validity and scope of consent decrees before them. This Court takes that responsibility seriously and has done so in the current case. To the extent the County argues that these cases compel a different interpretation of the consent decree here or mandate a different outcome on its Guaranty Clause claim, however, it seriously misreads the holdings of these cases. *Horne*, notably, does not contain a generalized admonition against consent decrees, but is concerned with Fed. R. Civ. P. 60(b) applications for modifications of consent decrees. In this context of consent decrees that have been in place for a long period of time, the Court was concerned that reviewing courts carefully consider the changed circumstances after the passage of many years when determining whether to alter or modify such agreements. *Horne*, 557 U.S. at 447-48. In *Frew*, the Court held that the enforcement of a consent decree did not violate the Eleventh Amendment. *Frew*, 540 U.S. at 436-41. This Court, applying *Frew*, has held that the case "reiterat[ed] the authority of a federal court to enforce federal consent decrees, as long as the decree was validly entered." *Barcia*, 367 F.3d at 102 (quoting *Frew*'s definition of "validly entered federal consent decrees as those that 'spring from a federal dispute and further the objectives of federal law'" (alterations omitted)). Further, both *Barcia* and *Frew* recognized that a party may move to modify a consent decree based on changed circumstances, including when "the objects of the decree have been attained." *Frew*, 540 U.S. at 442; *Barcia*, 367 F.3d at 102. The County would have this Court rely upon the legitimate concerns that motivate modification of long-standing consent decrees to allow the

21

County to shirk its voluntarily agreed to obligations, made less than four years ago, with no showing that the objects of the consent decree have been obtained and strong evidence indicating that they have not been.  This we will not do.

## CONCLUSION

For the reasons stated above, the judgment of the district court hereby is AFFIRMED.