15-2294-cv
*Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2015
No. 15-2294-cv

COUNTY OF WESTCHESTER,
*Plaintiff-Appellant,*

*v.*

UNITED STATES DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, AND JULIAN CASTRO, AS
SECRETARY OF HOUSING AND URBAN DEVELOPMENT,
*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of New York.

Nos. 1:13-cv-2741, 1:15-cv-1992—Denise L. Cote, *Judge.*

ARGUED: SEPTEMBER 22, 2015
DECIDED: SEPTEMBER 25, 2015

Before: CABRANES, RAGGI, and WESLEY, *Circuit Judges.*

Appeal from a grant of summary judgment by the United States District Court for the Southern District of New York (Denise L. Cote, *Judge*), dismissing the County of Westchester's challenge to the decision of the United States Department of Housing and Urban Development ("HUD" or "the Government") to withhold funds under Community Planning and Development Formula Grant Programs. The County principally asserts that HUD's withholding of these funds violated the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), and two other statutory provisions—42 U.S.C. §§ 12705 and 12711—that generally prohibit HUD's interference with local public policy. On July 21, 2015, the District Court entered judgment in favor of defendants HUD and Julian Castro, Secretary of HUD. Because HUD's decision to withhold the funds did not violate federal law, we **AFFIRM** the District Court's judgment of July 21, 2015. We also **VACATE IN PART** the temporary injunction issued *pendente lite* by a motions panel of this Court on May 1, 2015. HUD is authorized to reallocate the County's FY 2013 funds forthwith. As to the County's FY 2014 funds, however, HUD is directed to delay reallocating those funds until after the County exhausts its right to seek further review of this decision.

---

ROBERT F. MEEHAN, Westchester County Attorney (Linda M. Trentacoste, Adam Rodriguez, and Justin R. Adin, *on the brief*), Westchester County Attorney's Office, White Plains, NY, *for County of Westchester, Plaintiff-Appellant*.

DAVID J. KENNEDY (Benjamin H. Torrance, *on the brief*), Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for U.S. Department of Housing and Urban Development and Julian Castro, Secretary of Housing and Urban Development, Defendants-Appellees.*

PER CURIAM:

For nearly a decade, plaintiff-appellant the County of Westchester (the "County" or "Westchester") has been engaged in litigation with the United States Department of Housing and Urban Development ("HUD" or "the Government") over whether the County has adequately analyzed—in its applications for HUD funds—impediments to fair housing within the County's jurisdictions.[1]

---

[1] The County applies for and administers HUD grants on behalf of the Westchester Urban County Consortium, a collection of towns and villages that have entered into a cooperation agreement to jointly apply for HUD funds through the County. *Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*, Nos. 13 Civ. 2741 (DLC), 15 Civ. 1922 (DLC), 2015 WL 4388294, at *6 (S.D.N.Y. July 17, 2015). The municipalities of Mount Pleasant, Mount Vernon, New Rochelle, White Plains, and Yonkers do not belong to the Consortium. *Id.* at *6 n.5. For ease of reference, we refer to the County's submissions on behalf of the consortium as "the County's" submissions.

3

To receive grants from HUD, an applying jurisdiction, like the County, must submit an annual "Action Plan" detailing how the jurisdiction will use the grants.[2] Along with the Action Plan, the County must certify that it will "affirmatively further fair housing" ("AFFH").[3] Under HUD regulations, this means that the County must "conduct an analysis to identify impediments to fair housing choice within the jurisdiction" (an "analysis of impediments," or "AI") and promise to "take appropriate actions to overcome the effects of any impediments identified through that analysis."[4]

---

[2] *See* 24 C.F.R. §§ 91.15, 91.220. HUD has recently adopted a comprehensive overhaul of the regulations governing CPD grant application requirements. *See* Affirmatively Furthering Fair Housing, 80 Fed. Reg. 42,272 (July 16, 2015) (to be codified at 24 C.F.R. pts. 5, 91, 92, 570, 574, 576, 903). But as those amendments do not apply to the dispute here at issue, all citations to the relevant regulations refer to the versions in effect prior to the amendments.

[3] *See* 42 U.S.C. §§ 5304(b)(2), 12705(b)(15) (requiring certification that the jurisdiction "will affirmatively further fair housing"); 24 C.F.R. § 91.225(a)(1). The terms of art "fair housing" and "affirmatively further fair housing" are worth explaining briefly. Congress passed the Fair Housing Act ("FHA") in 1968 to "provide, within constitutional limitations, for *fair housing* throughout the United States." 42 U.S.C. § 3601 (emphasis supplied); Pub. L. No. 90-284, tit. VIII, § 801, 82 Stat. 73, 81 (1968). To this end, the FHA bans discrimination on the basis of "race, color, religion, sex, familial status, or national origin" in connection with the sale and rental of housing and other private real estate transactions. 42 U.S.C. §§ 3604, 3605. The market for housing is therefore "fair" if it is free from discrimination based on these protected characteristics. The Supreme Court recently held that "disparate-impact claims are cognizable under the [FHA]." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,* 135 S. Ct. 2507, 2525 (2015).

[4] 24 C.F.R. § 91.225(a)(1).

4

In this appeal, the County challenges final administrative determinations by HUD to withhold funds allocated to the County under the Community Planning and Development Formula Grant Programs ("CPD funds")[5] for fiscal years ("FY") 2011, 2013 and 2014.[6] The County's principal argument is that the conditions that HUD placed on the allocation of these CPD funds violated the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), and two other statutory provisions—42 U.S.C. §§ 12705 and 12711—that generally prohibit HUD's intrusion into local public policy.[7] In short, the County asserts that HUD's repeated rejection of the County's AIs turned on a factor—the substance of local zoning policies—that HUD was not permitted to consider.

On July 17, 2015, the United States District Court for the Southern District of New York (Denise L. Cote, *Judge*) granted

---

[5] The three CPD programs at issue are: (1) the Community Development Block Grant program ("CDBG"); (2) the Emergency Shelter Grant program ("ESG"); and (3) the HOME Investment Partnership program ("HOME").

[6] The County's first lawsuit, *Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*, No. 13 Civ. 2741 (DLC) (filed Apr. 24, 2013), addressed only FY 2011 CPD funds. The County's second lawsuit, *Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*, No. 15 Civ. 1992 (DLC) (filed Mar. 17, 2015), addressed FY 2012, 2013, and 2014 CPD funds. The two lawsuits were consolidated on April 15, 2015, and resolved by the District Court in the same final judgment, which is the subject of this appeal. *See* 2015 WL 4388294, at *19 n.20. Because the FY 2012 funds were already reallocated to other jurisdictions, the County's claims as to these funds are moot. *See id.* at *19.

[7] The County also stated claims under the Fifth Amendment to the U.S. Constitution, but it has not pursued them on appeal.

5

defendants-appellees' motion for summary judgment, holding that HUD's decision was not arbitrary or capricious and that § 12705 and § 12711 did "not relieve the County of its obligation to make accurate Certifications and to produce adequate AIs in order to obtain CPD Funds."[8] As to these "Certifications," the District Court concluded that HUD acted within its authority in determining that the County's AIs had failed to assess the impediments to fair housing choice caused by local zoning ordinances or to identify actions the County would take to overcome these impediments. Accordingly, the District Court held that HUD was justified in its conclusion that the County's plan would not "affirmatively further fair housing," as required by HUD regulations and the Fair Housing Act ("FHA").[9]

Because we agree that HUD's withholding of CPD funds did not violate federal law, we **AFFIRM** the District Court's judgment of July 21, 2015.[10] We also **VACATE IN PART** the temporary

---

[8] 2015 WL 4388294, at *1; *see id.* at *25.

[9] *See id.* *27.

[10] Due to the pending expiration of some of these funds, this appeal was resolved on an expedited basis. As noted above, the County seeks review of HUD's decision to withhold CPD funds for FY 2011, 2013, and 2014. The FY 2012 funds have already been reallocated to other jurisdictions. *See* note 6, *ante*.

The congressional appropriation for the FY 2011 funds expired on September 30, 2013. *See* Department of Defense and Full-Year Continuing Appropriations Act 2011, Pub. L. No. 112-10, Div. B, Title I, § 1103, 125 Stat. 38, 103 (2011) (carrying forward previous appropriations bill's limitation that CPD funds are available to be allocated for two years after the designated fiscal year). These funds, therefore, may not be reallocated to other jurisdictions, but they

injunction issued *pendente lite* by a motions panel of this Court on May 1, 2015. HUD is authorized to reallocate the County's FY 2013 funds forthwith. As to the County's FY 2014 funds, however, HUD is directed to delay reallocating those funds until after the County exhausts its right to seek further review of this decision.

---

remain available to the County until September 2018. *See* 31 U.S.C. §§ 1552(a), 1553(a); *Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412, 417 n.8 (2d Cir. 2015) (explaining that after an appropriation expires, unallocated funds remain in an "'expired account,' where they will 'retain their fiscal year identity . . . for that appropriation for an additional five fiscal years'") (quoting 1 Gov't Accountability Office, *Principles of Federal Appropriations Law* (*GAO Redbook*) 5–67, 5–72 (3d ed. 2004)) (ellipsis in original). Accordingly, because some of the FY 2011 funds remain available to satisfy obligations to the County, the pending dispute over these funds is not moot. *See* note 45, *post* (noting that a total of $752,844 remains from the County's FY 2011 allocation).

The congressional appropriation for the FY 2013 funds expires on September 30, 2015. *See* Consolidated and Further Continuing Appropriations Act 2013, Pub. L. No. 113-6, Div. F, Title I, § 1103, 127 Stat. 198, 412-13 (2013). Until then, HUD is able to reallocate the funds, which, according to HUD, total approximately $5 million. We have therefore sought to resolve this case expeditiously, in order to give HUD the flexibility—if it prevailed—to reallocate the FY 2013 funds to other jurisdictions.

Finally, the congressional appropriation for the FY 2014 funds expires on September 30, 2016. *See* Consolidated Appropriations Act 2014, Pub. L. No. 113-76, Div. L, Title 2, 128 Stat. 5, 613-14 (2014). Therefore, if HUD wishes to reallocate these funds—also totaling approximately $5 million—it must do so before that date. As noted above and below, HUD is directed not to reallocate the FY 2014 funds until the County exhausts its right to seek further review of this decision.

## BACKGROUND

In order to understand the current dispute between the County and HUD, it is necessary to review the last decade of litigation against the County.[11]

---

[11] The federal government's contentious relationship with Westchester County goes back several decades. In December 1980, the United States filed suit against the City of Yonkers (which is located in Westchester County) as well as the Yonkers Community Development Agency ("CDA") and the Yonkers Board of Education ("Board"), alleging that they intentionally selected subsidized housing sites in a manner that perpetuated residential racial segregation, which, in turn, caused and perpetuated school segregation. In June 1981, after the Yonkers Branch of the NAACP and one named plaintiff intervened on behalf of themselves and all others similarly situated, the case was certified as a class action. A 14-month liability trial was held before Judge Leonard B. Sand of the Southern District of New York in 1983 and 1984. Eighty-four witnesses testified over the course of 90 trial days, and the court received into evidence the depositions of 38 additional witnesses and thousands of documents.

In November 1985, Judge Sand found the City and CDA liable for housing segregation and the City and Board liable for school segregation. *See United States v. Yonkers Bd. of Educ.*, 624 F. Supp. 1276 (S.D.N.Y. 1985). Following a series of remedial hearings, the district court ordered the City to undertake several actions, including providing sites for 200 units of public housing in non-minority areas, and reallocating federal housing grants towards fostering the development of low- and moderate-income housing. The defendants appealed the judgment, and in 1987, our Court concluded that the district court "properly applied the appropriate legal principles, that its findings of fact [were] not clearly erroneous, and that its remedial orders [were] within the proper bounds of discretion." *See United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1184 (2d Cir. 1987). Accordingly, we affirmed the district court's judgment in all respects.

On July 3, 2007, the district court approved a settlement agreement that ended its supervision over implementing these Yonkers-related remedial orders. *See* No. 80 Civ. 6761 (LBS), Dkt. No. 2100 (S.D.N.Y. July 3, 2007).

## I. The 2006 Litigation and Consent Decree

In April 2006, the Anti-Discrimination Center of Metro New York ("the relator") filed a *qui tam* lawsuit alleging that the County violated the False Claims Act[12] by submitting "false" certifications to HUD from 2000 to 2006 in order to obtain approximately $52 million in housing grants. Under the relevant statutes and regulations, the County, as a recipient of HUD funds, was required to certify to HUD that it would "affirmatively further fair housing."[13] The relator alleged that the County's certifications were "false" within the meaning of the False Claims Act because the County failed to analyze impediments to fair housing or to develop strategies to overcome these impediments, despite certifying to HUD that it had done so.

During pretrial proceedings, the district court entered several rulings in favor of the relator. On July 13, 2007, it denied the County's motion to dismiss, holding that relator had stated a claim that the County violated the False Claims Act by falsely certifying that it considered race when evaluating fair housing impediments and corrective actions.[14] On February 24, 2009, the district court held

---

[12] 31 U.S.C. §§ 3729-33.

[13] *See* 42 U.S.C. §§ 5304(b)(2), 12705(b)(15).

[14] *See U.S. ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty.*, 495 F. Supp. 2d 375 (S.D.N.Y. 2007) (holding that a jurisdiction that certifies that it will affirmatively further fair housing as a condition to its receipt of federal funds must consider the existence and impact of racial discrimination on housing opportunities and choice).

that the County's certifications to HUD were false within the meaning of the False Claims Act, but it denied the relator's motion for summary judgment on the grounds that the County's *knowledge* that the certifications were "false" was a disputed issue of fact for trial.[15]

On August 10, 2009, the Government intervened in the action in place of the relator and, on the same day, presented the district court with a consent decree that all parties—including the County—agreed to enter.[16]

By settling the case and agreeing to the consent decree, the County avoided the risk of paying treble damages of more than $150 million. Instead, the decree obligated the County to pay $30 million to the United States—of which $21.6 million would be credited to the County's account with HUD—and to take numerous steps to further "fair housing."[17] Most relevant here, the County agreed to spend $30 million of its own funds—in addition to the $21.6 million

---

[15] *See U.S. ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty.*, 668 F. Supp. 2d 548 (S.D.N.Y. 2009) (denying cross-motions for summary judgment and reserving for trial on the County's *scienter*).

[16] *See* J.A. 353-391 ("Stipulation and Order of Settlement and Dismissal") ("Consent Decree").

[17] Consent Decree ¶¶ 2–3.

10

in its HUD account—to build 750 units of affordable housing over the following seven years.[18] The County was required to

> use all available means as appropriate to achieve the [building of the 750 units], including, but not limited to, developing financial or other incentives for other entities to take steps to promote [those] objectives . . . , and conditioning or withholding the provision of County funds on actions that promote [those] objectives . . . .[19]

The consent decree "anticipated that the County [would build these 750 units] by leveraging the funds that it is expending pursuant to [the consent decree] with supplemental funds."[20] Moreover,

> [i]n the event that a municipality does not take actions needed to promote the [building of the 750 units], or undertakes actions that hinder [those] objectives . . . , the County shall use all available means as appropriate to address such action or inaction, including, but not limited to, pursuing legal action.[21]

---

[18] Consent Decree ¶ 7. 630 of these 750 units must be built in municipalities that are less than three percent black and seven percent Hispanic.

[19] Consent Decree ¶ 7(i).

[20] *Id.*

[21] Consent Decree ¶ 7(j).

11

Additionally, the consent decree required the County to complete, within 120 days, an analysis of impediments to fair housing choice ("AI") "deemed acceptable by HUD."[22] The decree specifically required that the AI

> (b) identify and analyze, *inter alia:*
>
>> (i) the impediments to fair housing within its jurisdiction, including impediments based on race or municipal resistance to the development of affordable housing; [and]
>>
>> (ii) the appropriate actions the County will take to address and overcome the effects of those impediments . . . .[23]

The County also agreed to "promote, through the County Executive, legislation . . . to ban 'source-of-income' discrimination in housing."[24] Such legislation prohibits landlords from refusing to rent to a tenant because that tenant's income comes from Social Security

---

[22] Consent Decree ¶¶ 32, 32(b).

[23] Consent Decree ¶ 32(b). These requirements mirror those imposed by statute and regulation on all grant applicants, as discussed at notes 73 to 90, *post*, and accompanying text.

[24] Consent Decree ¶ 33(g).

benefits or from state or federal public assistance programs, such as "Section 8."[25]

Finally, the consent decree provided for the appointment of a monitor to oversee compliance, to recommended additional actions needed to ensure compliance, and to assess "whether the County has taken all possible actions to meet its obligations . . . including . . . promoting inclusionary and other appropriate zoning by municipalities by offering incentives, and, if necessary, taking legal action."[26] The appointment of the monitor was to last "for so long as the County's obligations" under the consent decree "remain unsatisfied."[27] The consent decree also created a dispute resolution process whereby the parties could submit grievances for the monitor to resolve.[28]

---

[25] Section 8 refers to a well-known program administered by HUD, which provides low-income housing assistance in the form of vouchers. *See Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 296 (2d Cir. 1998).

[26] Consent Decree ¶ 15.

[27] Consent Decree ¶ 10.

[28] Consent Decree ¶ 14. The consent decree provided for judicial review of the monitor's decisions:

> Within ten (10) business days of receipt of the Monitor's report and recommendation, the County or the Government may seek additional review from the magistrate judge assigned to this case; otherwise, the Monitor's resolution shall be final, binding and non-appealable. Should the County or the Government seek such additional review from the assigned magistrate judge, the relevant provisions of the Federal Rules of Civil Procedure, the

## II. 2011 Litigation

The August 2009 consent decree settled all False Claims Act charges stemming from the County's applications for HUD funding from 2000 to 2009. Since 2009, however, the County has continued to apply for CPD funds. The present dispute concerns HUD's rejection of the County's post-consent decree applications for funding. Specifically, this litigation concerns HUD's decision to withhold the County's CPD funds for FY 2011, 2013, and 2014.[29]

The County first challenged HUD's withholding of its CPD funds for FY 2011. As noted above, the consent decree required the County to make efforts to ban "source-of-income discrimination." In 2009, the County's Board of Legislators debated a bill to meet this obligation. The County Executive at the time, Andrew Spano, sent letters to advocacy organizations expressing support for the pending bill, and to the leadership of the County Board of Legislators encouraging them to pass the bill. Although the Board failed to pass the legislation in 2009, an identical bill was reintroduced in 2010. On June 14, 2010, the Board passed a slightly modified version of the

> Local Rules and the Court's Individual Rules governing reports
> and recommendations from a magistrate judge shall apply.

Consent Decree ¶ 14(d). The district court appointed as monitor James E. Johnson of Debevoise & Plimpton LLP.

[29] It is not apparent from the record whether the County received CPD funding for FY 2010. The County's CPD funds for FY 2012, however, were withheld and reallocated to other jurisdictions. *See* note 6, *ante*.

bill, but, on June 25, 2010, the newly elected County Executive, Robert Astorino, vetoed it.

Under the consent decree, the County's revised AI was due on December 8, 2009. After HUD granted several of the County's extension requests, the County submitted a revised AI on July 23, 2010. On December 21, 2010, HUD rejected the revised AI in a six-page letter to the County, in which HUD described actions the County could take to make its AI acceptable, including identifying the steps it would take to ban "source-of-income" discrimination and to overcome "exclusionary zoning practices." In April 2011, having not received a revised AI, HUD notified the County that it intended to reject the County's FY 2011 "certification" that the County would "affirmatively further fair housing."[30]

On July 11, 2011, the County submitted another revised AI, which HUD also rejected. By letter dated July 13, 2011, HUD rejected the County's proposed AI because it "did not incorporate the Corrective Actions" that HUD had earlier specified, including "promotion of source-of-income legislation or plans to overcome exclusionary zoning practices."[31] HUD therefore rejected the County's AI and disapproved its FY 2011 Action Plan "as substantially incomplete." Accordingly, HUD officially notified the County that it intended to withhold the funds allocated to the County for FY 2011.

---

[30] J.A. 113.

[31] J.A. 124-25.

15

HUD's withholding of FY 2011 funds prompted the referral of two issues to the monitor. On November 14, 2011, the monitor found that: (1) the County breached its obligation to promote source-of-income legislation; and (2) the County was required to analyze the effect of zoning ordinances in its AI.[32] On December 7, 2011, the County objected to the monitor's findings and sought review from Magistrate Judge Gabriel W. Gorenstein.

On March 16, 2012, Magistrate Judge Gorenstein sustained the County's objection to the monitor's report in part, concluding that the County Executive's veto of the source-of-income legislation did not constitute a breach of the consent decree.[33] Specifically, he held that the County Executive's obligation to *promote* the legislation did not obligate the County Executive to *sign* the bill once the Board of Legislators passed it.

However, Magistrate Judge Gorenstein overruled the County's other objections. Specifically, the County had challenged the monitor's conclusion that the County was required (1) to specify a strategy to overcome exclusionary zoning practices, and (2) to identify the types of zoning practices that would, if not remedied by

---

[32] *United States ex rel. Anti-Discrimination Ctr. v. Westchester Cty.*, No. 06 Civ. 2860 (DLC), 2011 WL 7563042, at *1 (S.D.N.Y. Nov. 14, 2011) ("2011 Report"). The monitor's first finding was later mooted by the County's adoption of "source-of-income" legislation. *See* note 45, *post*.

[33] *See United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty.*, No. 06 Civ. 2860 (DLC) (GWG), 2012 WL 917367, at *7 (S.D.N.Y. Mar. 16, 2012).

16

the municipality, prompt the County to pursue legal action. With respect to these objections, Magistrate Judge Gorenstein ruled in favor of HUD, concluding that the County was required to analyze the effect of zoning laws in its AI. Accordingly, Magistrate Judge Gorenstein held that the monitor and HUD could require the County to explain how it intended to persuade its municipalities to remove exclusionary zoning practices, and what steps it would take if a municipality refused. The County did not appeal this aspect of the Magistrate Judge's ruling.[34]

The United States did, however, appeal his ruling concerning "source-of-income" legislation. On May 3, 2012, the district court reversed this aspect of the ruling, agreeing with the monitor that the County Executive's veto of the source-of-income legislation was a breach of the consent decree.[35]

On April 5, 2013, we affirmed the May 3, 2012 order of the district court,[36] holding that: (1) the district court had jurisdiction over enforcement and interpretation of the consent decree; (2) the County breached its duty under the consent decree to promote source-of-income legislation through its County Executive; (3) the

---

[34] After neither party objected to the Magistrate Judge's rulings as to the zoning issues, the district court adopted them on appeal. *See United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty.*, No. 06 Civ. 2860 (DLC), 2012 WL 1574819, at \*11 (S.D.N.Y. May 3, 2012).

[35] *Id.*

[36] *See United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty.*, 712 F.3d 761 (2d Cir. 2013).

17

consent decree continued to bind successive elected County officials; (4) the "unmistakability doctrine"[37] did not apply to interpretation of the consent decree; (5) the consent decree did not strip the County of any essential attribute of sovereignty; and (6) the consent decree did not violate the Constitution's Guarantee Clause.[38]

## III. The 2013 Litigation

As noted above, the monitor's report in November 2011 found that the County was required to analyze the effect of zoning ordinances in its AI.[39] Specifically, the monitor concluded that

---

[37] The unmistakability doctrine is a rule of contract construction that provides that in a contract with a sovereign government, "an ambiguous term of a grant or contract [will not] be construed as a conveyance or surrender of sovereign power." *United States v. Winstar Corp.*, 518 U.S. 839, 878 (1996). We held that the unmistakability doctrine of contract construction did not apply to the interpretation of the consent decree, because the decree unambiguously required the County to encourage passage of the source-of-income legislation, which necessarily precluded the County Executive's veto of a bill passed by County Board. 712 F.3d at 772-73. Because the County expressly agreed to take specific action related to this legislation, the County was not "incidentally disabled" from undertaking any sovereign acts. *Id.*

[38] The Guarantee Clause, U.S. Const. art. IV, § 4, states that the "United States shall guarantee to every State in this Union a Republican Form of Government." We held that the County's claim under the Guarantee Clause was a nonjusticiable political question and, even if it was not, that the County failed to present any evidence that it was deprived of a republican form of government. *See* 712 F.3d at 774-75.

[39] Magistrate Judge Gorenstein overruled the County's objection to this ruling, and the County did not appeal. *See* note 34, *ante*, and accompanying text.

18

[t]he County should, at a minimum, assess the impact of each of the following zoning practices or explain why the analysis of the listed practices . . . would not be helpful to understanding the impact of the zoning ordinances taken as a whole:

- Restrictions that limit or prohibit multifamily housing development;

- Limitations on the size of a development;

- Limitations directed at Section 8 or other affordable housing, including limitations on such developments in a municipality;

- Restrictions that directly or indirectly limit the number of bedrooms in a unit;

- Restrictions on lot size or other density requirements that encourage single-family housing or restrict multifamily housing; and

- Limitations on townhouse development.[40]

---

Therefore, since 2012, HUD has considered the requirement that the County's AI include the effect of zoning policies to be law of the case.

[40] 2011 Report, 2011 WL 7563042, at *7. The monitor went on to direct the County to (1) "develop a clear strategy that encourages compliance by municipal governments . . . [and] explain[s] how [the County] intends to persuade municipalities to follow [its] recommendations and what additional steps, if any,

After the monitor issued his report in November 2011—and while litigation before the district court and this Court was pending—the County submitted a series of zoning analyses to HUD, all of which were rejected. Specifically, HUD informed the County that, in its view, the County's submissions contained flawed data analysis, failed to address whether zoning practices were exclusionary under state and federal law, and lacked adequate strategies for bringing about changes to problematic zoning practices in some of the County's municipalities.

On March 25, 2013, HUD notified the County that it intended to reallocate the $7.4 million it had withheld in FY 2011 funds.[41] Because the congressional appropriation for these funds was set to expire on September 30, 2013, HUD gave the County until April 25,

it will take if those recommendations are not followed"; (2) "[d]evelop a process for notifying municipalities of zoning issues that hinder the County's obligations under the Settlement and changes that must be made, and if not made, the consequences of municipalities' failure to make them"; (3) "[d]evelop a process to involve municipal decision-makers in consultation regarding changes in zoning and land use restrictions"; and (4) "[p]rovide a description of how these requirements will be included in future contracts or other written agreements between the County and municipalities." *Id.* at *7-8. The monitor also expressed "the view that litigation is a powerful lever the County may exercise to bring municipal governments into compliance, and that the County must identify the types of zoning practices that would, if not remedied by the municipality, lead the County to pursue legal action." *Id.* at *9.

[41] J.A. 236-38. The breakdown was approximately $5.4 million in CDBG funds, $1.7 million in HOME funds, and $400,000 in ESG funds. *See* 2015 WL 4388294, at *13 n.10.

2013 to submit an acceptable AI and Action Plan to address "exclusionary zoning."

One day before this deadline, the County submitted a revised AI and filed suit against HUD in federal court, asserting that HUD's denial of the County's CPD funds for FY 2011 was a violation of the APA and 42 U.S.C. § 12711.[42] As relief, the County requested that the court: (1) enjoin HUD's reallocation of the County's FY 2011 grant funds; (2) declare that HUD's rejection of its FY 2011 AI and Action Plan violated the APA and § 12711; and (3) order HUD to approve the County's FY 2011 submission for CPD funds.[43]

On August 14, 2013, Judge Cote granted HUD's motion to dismiss the complaint in its entirety. As to the APA claims, the district court ruled that HUD's rejection of the County's submissions was an act "committed to agency discretion by law," *see* 5 U.S.C.

---

[42] Section 12711 states:

Notwithstanding any other provision of this subchapter or subchapter II of this chapter, the Secretary shall not establish any criteria for allocating or denying funds made available under programs administered by the Secretary based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law that is (1) adopted, continued, or discontinued in accordance with the jurisdiction's duly established authority, and (2) not in violation of any Federal law.

[43] *See Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*, No. 13 Civ. 2741 (DLC) (filed Apr. 24, 2013).

§ 701(a)(2), and thus not subject to judicial review.[44] The district court also concluded that the County failed to state a claim under § 12711.[45]

On February 18, 2015, we affirmed the dismissal (as moot) of claims relating to funds that had been reallocated to other jurisdictions, but vacated the district court's dismissal of claims relating to funds—exclusively under the HOME program—that had not yet been reallocated.[46] We concluded that the district court erred in dismissing the County's APA claims as to these funds, because the statutes governing HUD's administration of the HOME program provided meaningful standards against which to judge HUD's exercise of discretion and, thus, HUD's actions were not "committed to agency discretion by law" and could be reviewed by the courts.

---

[44] *See Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*, No. 13 Civ. 2741 (DLC), 2013 WL 4400843, at *3 (S.D.N.Y. Aug. 14, 2013).

[45] The County appealed this ruling and, on August 20, 2013, sought a temporary restraining order and preliminary injunction. HUD agreed not to obligate funds to other jurisdictions until a panel of this Court considered the County's application. On September 25, 2013, we denied the application for a stay. *See Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 531 F. App'x 178 (2d Cir. 2013) (summary order). We also dismissed as moot the County's appeal from the dismissal of its § 12711 claim—which had been based on the failure to adopt "source-of-income" legislation—because, by that time, the County had passed such legislation. *Id.* HUD subsequently reallocated the majority of the County's FY 2011 grant allocation before the appropriation expired on September 30, 2013. Of the approximately $7.4 million initially allocated to the County, all but $752,844 was reallocated.

[46] See *Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412 (2d Cir. 2015).

Accordingly, we affirmed the district court's order of dismissal insofar as it dismissed as moot claims for funds that had been reallocated to other jurisdictions, vacated the order insofar as it dismissed claims for the remaining $752,844 in HOME funds that had not been reallocated, and remanded the cause to the district court for further proceedings.

## IV. The Monitor's Zoning Analysis

While proceedings concerning the FY 2011 funds were pending, the monitor prepared two reports on the impact of zoning laws in Westchester County.[47]

The first of these reports, filed on September 13, 2013,[48] analyzed the zoning codes of the municipalities in the County under state and federal law—applying *Berenson v. Town of New Castle*, 38 N.Y.2d 102 (1975), and *Huntington Branch, NAACP v. Town of*

---

[47] The County asserts that the monitor lacks authority to conduct such an analysis. However, as Magistrate Judge Gorenstein stated in 2012, the monitor is required under the consent decree to "conduct an assessment of the County's efforts and progress related to the obligations set forth in [the consent decree], particularly those described in paragraph 7," and "the Monitor 'may consider any information appropriate' that will help him 'determine whether the County has taken all possible actions to meet its obligations under this [consent decree], including, but not limited to . . . promoting inclusionary and other appropriate zoning by municipalities by offering incentives, and, if necessary, taking legal action.'" 2012 WL 917367, at *7 (quoting Consent Decree ¶ 15). The County did not appeal this ruling, and the district court adopted it. *See* 2012 WL 1574819, at *11; *see also* note 34, *ante*, and accompanying text.

[48] *See* J.A. 404-64.

23

*Huntington*, 844 F.2d 926 (2d Cir.), *aff'd in part*, 488 U.S. 15 (1988). The state-law *Berenson* standard considers whether zoning practices are "exclusionary" based on socioeconomic status.[49] The federal *Huntington* standard considers whether facially neutral zoning laws have a discriminatory impact on racial and ethnic minorities.[50]

In its various AIs submitted to HUD, the County concluded that there was no evidence of exclusionary zoning in any of the 31 eligible municipalities in Westchester County.[51] HUD concluded that

---

[49] Under *Berenson*, a municipality's zoning statute is examined as a whole to determine whether it fosters "a balanced and integrated community." *Berenson*, 38 N.Y.2d at 109. The analysis consists of two prongs: (1) the municipality must "provide[ ] a properly balanced and well[-]ordered plan for the community," *id.* at 110; and (2) municipalities must consider, weigh, and balance both local and regional housing needs due to the effect that zoning ordinances may have on areas outside the municipality, *see id.*

[50] Under *Huntington*, a zoning code is presumptively exclusionary if it (1) restricts multifamily or two-family housing to districts with disproportionately large minority populations; or (2) disparately impacts minorities by restricting the development of housing types disproportionately used by minority residents. "Once a plaintiff has made a prima facie showing of discriminatory effect, a defendant must present bona fide and legitimate justifications for its action with no less discriminatory alternatives available." *Huntington*, 844 F.2d at 939; *but see Inclusive Communities*, 135 S. Ct. at 2523 ("A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact."); *id.* ("Zoning officials . . . must often make decisions based on a mix of factors, both objective (such as cost and traffic patterns) and, at least to some extent, subjective (such as preserving historic architecture).").

[51] These 31 municipalities are Ardsley, Bedford, Briarcliff Manor, Bronxville, Buchanan, Cortlandt, Croton-on-Hudson, Dobbs Ferry, Eastchester, Harrison, Hastings-on-Hudson, Irvington, Larchmont, Lewisboro, Mamaroneck, Mount Pleasant, New Castle, North Castle, North Salem, Ossining, Pelham,

these AIs were inadequate for various reasons, including that they used inaccurate data, conducted flawed analysis concerning whether zoning laws within the County were exclusionary, and failed to propose strategies for overcoming exclusionary zoning laws in certain municipalities.

The purpose of the monitor's 2013 report was to assess whether the County was correct that none of its 31 eligible communities had exclusionary zoning laws, or whether HUD was correct that the County's analysis was flawed, inaccurate, and incomplete. The monitor concluded:

> Twenty-four out of 31 municipalities provide opportunities to develop affordable housing and four of these municipalities have zoning codes that provide sufficient opportunities for affordable housing to meet regional need and are exemplary in terms of their efforts to provide opportunities for affordable housing. Seven municipalities, however, have restrictions on multifamily housing and other sources of affordable housing that would meet the definition of exclusionary under the *Berenson* line of cases. Additionally, some municipalities, whether likely to be deemed exclusionary under *Berenson* or not, have evidence that

---

Pelham Manor, Pleasantville, Pound Ridge, Rye, Rye Brook, Scarsdale, Somers, Tarrytown, Tuckahoe, and Yorktown. J.A. 473-74.

limitations on multifamily zoning might have a disparate impact on certain minority groups, suggesting that they might be deemed exclusionary under *Huntington*. Therefore, the County's conclusion that exclusionary zoning does not exist anywhere in Westchester is not supported by its own data.[52]

The seven municipalities that the monitor concluded "had zoning ordinances that limited affordable housing or made the development of affordable housing practically infeasible" were Croton-on-Hudson, Harrison, Lewisboro, Mamaroneck, Ossining, Pelham Manor, and Pound Ridge.[53] After the report was issued, however, each of these municipalities met with the monitor, and three of them—Mamaroneck, Ossining, and Pound Ridge—were removed from the list. As the monitor later explained, Mamaroneck "adopted the model zoning ordinance, expanded the allowance of multifamily housing, and approved the construction of ten affordable housing units."[54] Ossining and Pound Ridge also "made considerable progress in reforming their zoning codes to expand opportunities for the development of affordable housing."[55]

---

[52] J.A. 456-57.

[53] J.A. 1045 (applying the two-prong analysis of *Berenson*, 38 N.Y.2d at 102).

[54] J.A.1045-46.

[55] J.A.1046.

26

On September 8, 2014, the monitor issued another report.[56] The 2013 report had mostly analyzed whether the jurisdiction's zoning codes were socioeconomically exclusionary under *Berenson*. The 2014 report focused on whether the jurisdiction's zoning codes had a discriminatory impact on racial and ethnic minorities under *Huntington.* The monitor concluded:

> Of the 31 eligible municipalities, 25 municipalities neither perpetuated racial and ethnic clustering by restricting multifamily or affordable housing to districts with a disproportionately large minority population nor disparately impacted the countywide minority household population by restricting the development of housing that minority residents disproportionately use in violation of the *Huntington* standard.
>
> *Prima facie* evidence of *Huntington* violations did exist, however, with respect to six municipalities. The evidence shows that these municipalities either restricted as-of-right multi- or two-family housing development to districts with disproportionately high minority household populations or restricted the development

---

[56] *See* J.A. 465-588. The District Court did not consider the 2014 report to be part of the administrative record because it post-dated the HUD decisions challenged by the County in this litigation. *See* 2015 WL 4388294, at *26 n.26.

of housing types disproportionately used by minorities. The next step for these municipalities is to present evidence that, despite the impact on minority residents, their zoning ordinances were furthering a legitimate, substantial governmental interest and no alternative would achieve that interest with less discriminatory effect. The [m]onitor looks forward to engaging with these six municipalities in the future.[57]

The six municipalities that the monitor concluded had zoning codes that were presumptively exclusionary under *Huntington* were Harrison, Larchmont, Lewisboro, North Castle, Pelham Manor, and Rye Brook.[58]

On October 24, 2014, the Government sent a letter to the monitor—with a copy sent to the County—which stated that the County's adoption of the monitor's 2013 and 2014 reports would satisfy its obligation to submit an acceptable AI.[59] Specifically, the Government stated that the submission of these reports "would satisfy the County's obligation to identify zoning ordinances that act as impediments to fair housing, as required by the [consent decree],

---

[57] J.A. 587-88.

[58] J.A. 474.

[59] J.A. 589-92.

28

42 U.S.C. §§ 5304(b)(2) and 12705(b)(15), 24 C.F.R. § 91.225(a)(1), and by HUD's Fair Housing Planning Guide."[60]

The County declined to adopt the monitor's reports or to incorporate any of the findings of the reports into its own future AIs.

## V. This Case

On February 3, 2015, HUD advised the County that its failure to receive a grant for FY 2012 had resulted in the termination of its qualification as a Community Development Block Grant ("CDBG") urban county and HOME participating jurisdiction, and that until it requalified, it was ineligible to receive CPD funds.[61] This termination also affected the remainder of the County's FY 2013 and FY 2014 funds under the CDBG and HOME programs, and HUD advised the County that it would proceed to reallocate these funds as well.[62] The County's total allocation for FY 2013 and FY 2014 was approximately $10 million.

---

[60] J.A. 589.

[61] *See* J.A. 78. HUD had previously notified the County of its rejection of the County's FY 2012 certification and disapproval of the 2012 Action Plan. On April 23, 2014, HUD informed the County that it was reallocating its FY 2012 funds, which totaled approximately $5.2 million. *See id.* The County did not take any legal action to prevent reallocation of these funds, which, as of September 30, 2014, were obligated to other jurisdictions. *Id.*

On May 9, 2014, the County informed HUD that it would not be seeking requalification under the CPD programs for the FY 2015 to FY 2017 period. *See id.*; 2015 WL 4388294 at *2 n.3, *18.

[62] *See* J.A. 78.

On March 17, 2015, the County filed its second lawsuit, which primarily sought to enjoin the reallocation of FY 2013 and FY 2014 CPD funds.[63] The case was deemed related to the 2013 litigation and assigned to Judge Cote.

On March 19, 2015, HUD informed the County that its FY 2013 and FY 2014 CPD Funds could be "obligated" to other jurisdictions as early as April 3, 2015.[64] That same day, the County filed a motion for a preliminary injunction to prevent HUD from disbursing the County's CPD Funds for FY 2013 and FY 2014 to other jurisdictions.[65] On March 27, 2015, the District Court denied the motion for a preliminary injunction from the bench, concluding that the County had failed to establish "irreparable harm" or "likelihood of success on the merits."[66] The District Court ordered an expedited schedule for the underlying merits litigation, whereby the parties would submit their cross-motions for summary judgment by May 22, 2015.

---

[63] *See Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*, No. 15 Civ. 1992 (DLC) (filed Mar. 17, 2015). The County abandoned its claims for FY 2012 CPD funds and all lead-paint grant funds, which were reallocated before this lawsuit. *See* 2015 WL 4388294 at *20 & n.21.

[64] J.A. 83.

[65] At a hearing on March 27, 2015 before Judge Cote, the Government explained that these funds were already in the process of being reallocated to other jurisdictions—the CDBG funds to other municipalities in the region, including New York, Yonkers, and Mount Vernon, the HOME funds to approximately 588 other municipalities, and the ESG funds to the State of New York for use within the County. *See* J.A. 632-33.

[66] J.A. 655-59.

On March 30, 2015, the County appealed the District Court's denial of its motion for a preliminary injunction. On April 3, 2015, the County filed a motion with this Court for an injunction pending appeal and for a Temporary Restraining Order ("TRO"). On April 20, 2015, this Court granted the County's request for a TRO pending resolution of its motion.[67] On May 1, 2015, a motions panel of this Court granted the County's motion and enjoined HUD from obligating the FY 2013 or FY 2014 funds at issue during the pendency of the County's appeal from the denial of the preliminary injunction.[68]

On July 17, 2015, while the County's appeal from the denial of the preliminary injunction was pending, the District Court resolved the case on the merits, granting HUD's motion for summary judgment and dismissing the County's complaints in their entirety.[69] Because both sides agreed that this final judgment mooted the County's then-pending appeal, we dismissed that appeal, but left in place an injunction pending resolution of the appeal from the District Court's July 21, 2015 final judgment.[70] This appeal then followed.

---

[67] *See* No. 15-979-cv, Dkt. No. 34 ("HUD shall not reallocate the County's entitlement [to] FY 2013 and FY 2014 CPD Funds pending resolution of the County's motion.").

[68] *See* No. 15-979-cv, Dkt. No. 39.

[69] *See* 2015 WL 4388294, at *6. As noted above, the two complaints resolved by the District Court were No. 13 Civ. 2741 and No. 15 Civ. 1992.

[70] *See* No. 15-979-cv, Dkt. Nos. 90, 100; No. 15-2294-cv, Dkt. No. 13.

31

## DISCUSSION

The broader dispute between the County and HUD implicates many "big-picture" questions. Beyond prohibiting direct discrimination based on race or other protected categories, what must a jurisdiction do to "affirmatively further fair housing"? What is the difference, if any, between furthering "fair" housing and furthering "affordable" housing? How much control may HUD exert over local policies, which, in its view, impede the creation of "fair" or "affordable" housing? And if conflicts of this sort between HUD and local governments are to be avoided, is the simplest solution to avoid applying for federal funds in the first place?

This appeal, however, presents a much narrower question: May HUD reject a jurisdiction's application for funding because it determines that the jurisdiction's analysis of impediments fails to adequately consider the potential exclusionary impact of the jurisdiction's zoning laws?[71] Because the answer to this narrow question is yes, we affirm the District Court's judgment.

---

[71] Or to put it another way: can a local government that applies for HUD grants avoid complying with the conditions imposed by HUD? The answer—as many local governments have discovered to their sorrow, in a variety of settings involving federal grants and contracts—is *no. See generally* Richard B. Cappalli, *Rights and Remedies Under Federal Grants* (Bureau of National Affairs 1979).

In the sections that follow, we first describe the relevant statutory requirements and then analyze the County's challenge to HUD's action under the APA and §§ 12705 and 12711.[72]

## I. Statutory Framework

The County challenges HUD's withholding of Community Planning and Development Formula Grant Program ("CPD") funds distributed under three different programs: the Community Development Block Grant ("CDBG") program, the Emergency Solutions Grant ("ESG") program, and the HOME Investment Partnerships program ("HOME"). The authorizing statutes for these three programs incorporate the Fair Housing Act by reference.

The CDBG program was established under the Housing and Development Act of 1974[73] to promote the "development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities,

---

[72] Before the District Court, HUD argued in the alternative that it could withhold CPD funds because the County breached the consent decree. As noted above, the consent decree obligated the County to provide an AI by December 2009 that HUD deemed acceptable. Because we conclude that HUD's withholding of the County's CPD funds did not violate federal law, we decline to reach or decide whether HUD could also withhold these funds solely because the County breached the consent decree. We note, however, that nothing in the consent decree purports to give HUD any broader authority to reject future grant applications than already provided by statute. *See* note 97, *post*, and accompanying text.

[73] 42 U.S.C. §§ 5301-5321 ("CDBG statute").

principally for persons of low and moderate income."[74] Jurisdictions applying for CDBG grants must certify—"to the satisfaction of the Secretary"—that they meet six criteria.[75] As relevant here, applicants must certify that "the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and [that] the grantee will affirmatively further fair housing."[76]

The ESG program was initially authorized as the "Emergency Shelter Grants" program by the Stewart B. McKinney Homeless Assistance Act of 1987, but was modified to its current form by the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act of 2009.[77] The principal purpose of the program is "to provide funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans."[78] Although the ESG program does not have any independent certification requirements, a grantee may only receive ESG funds if it also receives funds under

---

[74] *Id.* § 5301(c).

[75] *See id.* § 5304(b).

[76] *Id.* § 5304(b)(2) (internal citations omitted). *See* note 3, *ante*, on the statutory term of art "affirmatively further fair housing," or AFFH.

[77] 42 U.S.C. §§ 11371-11378 ("ESG statute"); *see* Pub. L. No. 111–22, 123 Stat. 1632, 1663 (2009); Pub. L. No. 100–77, 101 Stat. 482 (1987).

[78] *Id.* § 11301(b)(3).

the CDBG program.[79] Accordingly, eligibility for ESG also turns on certifying that a "grantee will affirmatively further fair housing."[80]

Finally, funding under the HOME program is allocated under the Cranston-Gonzalez National Affordable Housing Act of 1990.[81] The objective of HOME grants is to "improve housing opportunities for all residents of the United States, particularly members of disadvantaged minorities, on a nondiscriminatory basis."[82] Like CDBG and ESG applicants, HOME applicants must certify "that the jurisdiction will affirmatively further fair housing."[83]

Each of these grant programs requires an applying jurisdiction to submit to HUD a comprehensive "housing affordability strategy" in accordance with 42 U.S.C. § 12705.[84] Section 12705(b) lists twenty components of a housing strategy, two of which are relevant here. First, § 12705(b)(4) requires grantees to

> explain whether the cost of housing or the incentives to develop, maintain, or improve affordable housing in the jurisdiction are affected by public policies, particularly by

---

[79] *See id.* § 11373(a).

[80] *See id.* § 5304(b)(2).

[81] 42 U.S.C. §§ 12701-12714, 12741-12756; *see* Pub. L. No. 101–625, 104 Stat. 4079 (1990).

[82] *Id.* § 12702(3).

[83] *Id.* § 12705(b)(15).

[84] *See id.* §§ 5304(c), 12746.

policies of the jurisdiction, including tax policies affecting land and other property, land use controls, *zoning ordinances*, building codes, fees and charges, growth limits, and policies that affect the return on residential investment, and *describe the jurisdiction's strategy to remove or ameliorate negative effects, if any, of such policies . . . .*[85]

Second, grantees must certify "that the jurisdiction will affirmatively further fair housing."[86]

The requirement to "affirmatively further fair housing" is identical under HOME and CDBG—and, by extension, ESG.[87] The certification that a jurisdiction will affirmatively further fair housing is a "written assertion, based on supporting evidence," that "will be deemed to be accurate . . . unless the Secretary determines otherwise after inspecting the evidence and providing due notice and opportunity for comment."[88] By regulation, the mandate to "affirmatively further fair housing" requires the grantee to "conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records

---

[85] *Id.* § 12705(b)(4) (emphases supplied).

[86] *Id.* § 12705(b)(15).

[87] *See* note 3, *ante*, on the statutory term of art "affirmatively further fair housing," or AFFH.

[88] 42 U.S.C. § 12704(21).

reflecting the analysis and actions in this regard."[89] Moreover, grantees under all three programs must recertify each year that they are fulfilling their obligation to "affirmatively further fair housing."[90]

## II. HUD's Action Did Not Violate Federal Law

In this case, HUD determined that the AIs submitted by the County in support of its applications for FY 2011, 2013, and 2014 funds were inadequate, because they failed to accurately analyze impediments to fair housing, including certain zoning laws. Accordingly, HUD rejected the County's certification that it would "affirmatively further fair housing," and withheld the County's funds under all three programs.[91]

---

[89] 24 C.F.R. § 91.225(a)(1).

[90] 42 U.S.C. § 12708(a)(1); 24 C.F.R. § 91.15(b)(1).

[91] We held in our February 2015 decision that the County is entitled to judicial review of HUD's decision to deny funding under the HOME statute. *See* 778 F.3d at 419-20. Here, the District Court concluded in its final judgment that the County is also entitled to judicial review of HUD's decision to deny funding under the CDBG and ESG statutes. For purposes of this appeal, we assume without deciding that the District Court was correct, and that the County is entitled to judicial review of HUD's decisions regarding the allocation of funds under all three programs. We are confident in this assumption because the statutory limits on HUD's authority identified in our February 2015 decision—§ 12705(c) and § 12711—apply to all three grant programs. *See* 42 U.S.C. §§ 5304(c), 12746.

The County asserts that HUD's decision to withhold these funds violated the APA and two other statutory provisions—§§ 12705 and 12711. We address each claim in turn.[92]

## A. The APA

Under the APA, a reviewing court must uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[93] Under this "deferential standard of review," we "may not substitute our judgment for that of the agency."[94] The scope of review under this standard is narrow because "a court must be reluctant to reverse results supported by a weight of considered and carefully articulated expert opinion."[95] An agency decision will thus only be set aside if it

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that

---

[92] We review a district court's grant of summary judgment *de novo*. *Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013).

[93] 5 U.S.C. § 706(2)(A).

[94] *Guertin v. United States*, 743 F.3d 382, 385-86 (2d Cir. 2014) (internal quotation marks and alterations omitted).

[95] *Fund for Animals v. Kempthorne*, 538 F.3d 124, 132 (2d Cir. 2008) (internal quotation marks and alterations omitted).

it could not be ascribed to a difference in view or the product of agency expertise.[96]

The relevant agency action here was HUD's decision to reject the County's AIs for FY 2011, 2013, and 2014, and to withhold the CPD funds allocated to the County for all three years. Before 2006—when the *qui tam* action was filed—HUD had for decades approved the County's applications for CPD funds without any objection. However, once the District Court ruled, in connection with the *qui tam* case, that HUD's submissions were false as a matter of law, the County unexpectedly faced the prospect of severe financial penalties—more than $150 million. The County Executive at the time chose to settle the case and to sign the consent decree.

But nothing in that consent decree purports to give HUD authority to impose conditions on the County's *future* CPD grant applications beyond those governing all applicants under the relevant statutes and regulations. Rather, as discussed at notes 16 to 28, *ante*, and accompanying text, the consent decree largely involves a promise to construct 750 new affordable housing units and a series of promises peripheral to that goal. The County also promised to submit an adequate AI within 120 days of the consent decree, and failure to do so could, therefore, constitute both a breach of the consent decree *and* grounds for rejection of its future CPD grant applications. But many of the promises the County made in the

---

[96] *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 446 (2d Cir. 2013) (quoting *Nat'l Assoc. of Home Builders v. Def. of Wildlife*, 551 U.S. 644, 658 (2007)).

consent decree, such as the promise to promote "source-of-income" legislation, are independent of the requirements for CPD grant eligibility. To the extent HUD has identified the County's failure to satisfy these independent consent-decree requirements to support its rejection of County grant applications,[97] HUD may well have overstepped the bounds of its statutory authority.

That said, we need not definitively decide whether, or to what degree, HUD may have overstepped statutory grounds in denying County grant applications, because HUD has consistently explained that its primary justification for such rejections has been that the County's AIs contained inadequate analysis and reached conclusions—that no municipality's zoning laws are exclusionary under state or federal law—unsupported by the record.

We are obliged under the APA to uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[98] And we agree with the District Court that HUD's decision to reject the AIs associated with the County's applications for FY 2011, 2013 and 2014 funds did not rise to such a

---

[97] *See, e.g.*, J.A. 124 (July 13, 2011 letter from HUD rejecting the County's FY 2011 CPD applications, stating: "The revised AI . . . does not meet the Settlement's requirements for an acceptable AI . . . [because it does not] address deficiencies regarding promotion of source-of-income legislation or plans to overcome exclusionary zoning practices. . . . Therefore, HUD is . . . disapproving the County's FY 2011 Action Plan as substantially incomplete.").

[98] 5 U.S.C. § 706(2)(A).

level. Because exclusionary zoning can violate the FHA,[99] and because HUD is required to further the policies of that statute,[100] it was reasonable for HUD to require the County to include in its AI an analysis of its municipalities' zoning laws. Moreover, in concluding that the County's zoning analysis was flawed and incomplete, HUD reasonably relied on detailed reports from the monitor, which examined the relevant laws and analyzed the empirical data, and which refuted the County's conclusion that no municipality had ordinances that were exclusionary under state or federal law. Whenever HUD rejected an AI submitted by the County, it provided a written explanation grounded in the evidentiary record, and it gave the County multiple opportunities to make changes and to resubmit a revised AI.[101] We therefore conclude that HUD's decision to withhold and then reallocate the

---

[99] *See Inclusive Communities*, 135 S. Ct. at 2521-22 (noting that the FHA "was enacted to eradicate discriminatory practices" within the housing sector, "includ[ing] zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification").

[100] *See, e.g.*, 42 U.S.C. § 3608(e)(5) (requiring HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [the FHA]").

[101] *See* J.A. 266-67 (April 23, 2014 letter summarizing HUD's past rejections of the County's AIs and HUD's offers of assistance); *see also* 24 C.F.R. § 91.500(b)(3) (defining a "substantially incomplete" plan as one "for which a certification is rejected by HUD as inaccurate, after HUD has inspected the evidence and provided due notice and opportunity to the jurisdiction for comment").

County's CPD funds was neither arbitrary nor capricious within the meaning of the APA.

Accordingly, we affirm the District Court's judgment insofar as it dismissed the claim that HUD's action violated the APA.

## B. Sections 12705 and 12711

The County's arguments under § 12705 and § 12711 fare no better. These two provisions generally preclude HUD from requiring a jurisdiction to change its local policies—including its zoning laws—in order to qualify for CPD funding. According to the County, HUD's decision to withhold the CPD funds at issue was a thinly veiled attempt to induce the County to force its municipalities to change their zoning laws. Specifically, the County claims that two demands by HUD were improper: (1) that the County change the conclusions in its AIs concerning the exclusionary impact of municipal zoning laws; and (2) that its AIs identify the steps the County would take to ensure its municipalities changed any exclusionary zoning laws.

Under § 12705(c)(1), HUD may only disapprove of the housing strategy of an applying jurisdiction if it concludes that

> (A) the housing strategy is inconsistent with the purposes of [the] Act, or
> (B) the information described in subsection (b) of this section has not been provided in a substantially complete manner. For the purpose of the preceding sentence, *the*

*adoption or continuation of a public policy identified pursuant to subsection (b)(4) of this section shall not be a basis for the Secretary's disapproval of a housing strategy.*[102]

The cross-referenced paragraph, § 12705(b)(4), requires grantees' housing strategies to explain how certain factors, including "zoning ordinances," affect "the cost of housing or the incentives to develop, maintain, or improve affordable housing in the jurisdiction."[103]

Section 12705(c) thus provides that the continuation or adoption of local zoning ordinances may not form the basis for HUD's disapproval of a jurisdiction's housing strategy. Section 12711 similarly prohibits HUD from denying funds based on "the adoption, continuation, or discontinuation by a jurisdiction of *any public policy, regulation, or law* that is (1) adopted, continued, or discontinued in accordance with the jurisdiction's duly established authority, and (2) not in violation of any Federal law."[104]

The County is therefore correct that HUD may not—under either § 12705 or § 12711—*condition* funding on changes to local

---

[102] 42 U.S.C. § 12705(c)(1) (emphasis supplied).

[103] *Id*. § 12705(b)(4).

[104] *Id.* § 12711 (emphasis supplied); *see also* S. Rep. No. 101-316, at 40 (1990), *reprinted in* 1990 U.S.C.C.A.N. 5763, 5806 ("[T]he Committee bill does not permit HUD (1) to disapprove of a housing strategy because of HUD's disagreement with any policies identified under section [12705(b)(4)] or (2) to require a change in any such policy as a prerequisite to allocation of assistance under this or another Act.").

policies, including zoning laws. But that is not what HUD did here. HUD did not at any point tell the County that its CPD funds would only be released if certain municipalities in the County *changed* their zoning laws. Instead, HUD required the County to assess and analyze *whether* certain zoning laws in the jurisdiction impeded fair housing and, if so, to identify a plan to overcome the effects of such impediments. As the Supreme Court recently stated, challenges to zoning laws and other housing restrictions "that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification . . . reside at the heartland of disparate-impact [fair housing] liability."[105] No federal law *requires* HUD to accept a jurisdiction's AI, particularly if HUD concludes that the analysis on which the AI is based is unreliable or methodologically unsound. Rather, the statute requires that a jurisdiction's certification to HUD be accurate and based on "supporting evidence,"[106] and HUD is permitted to reject a housing strategy as "substantially incomplete" if it decides that the AI and the associated certification are flawed or inaccurate.[107]

---

[105] *Inclusive Communities*, 135 S. Ct. at 2521-22; *see also Huntington v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15, 16-18 (1988) (*per curiam*) (invalidating zoning law preventing construction of multifamily rental units).

[106] 42 U.S.C. § 12704(21).

[107] *See* 24 C.F.R. § 91.500(b) (giving HUD the authority to "disapprove a plan or a portion of a plan" if it determines that the supporting certification is "inaccurate").

Here, HUD rejected the County's AI because the County reached the same boilerplate conclusion for every municipality—namely, that the local zoning laws did not have a disparate impact on minorities and did not pose an impediment to affirmatively furthering fair housing with respect to race. HUD determined that this repetitive conclusion for each municipality was not supported by the available data and did not reflect an adequate disparate impact analysis, because,

> [a]s the County itself acknowledges, Restrictive Practices exist in these municipalities that have the effect of limiting the availability of affordable housing. Such limitations may in fact have an exclusionary effect based on race, national origin, or familial status, which the data supports. The [County's] refusal to acknowledge any connection between zoning restrictions that affect the availability and location of affordable housing and fair housing protections directly challenges the Court's rulings on the matter and the [consent decree] itself. HUD therefore cannot accept the County's Zoning Submission. Thus, the County's AI remains unacceptable.[108]

---

[108] J.A. 261-62 (HUD's August 9, 2013 letter to the County) (footnote omitted).

As HUD made clear in this letter, the basis for its rejection of the County's AI was not that the County's municipalities failed to *change* their zoning laws. It was that HUD determined—based on its own review of the laws and the data, as well as the monitor's reports—that the County's zoning *analysis* was flawed, inaccurate, and incomplete. Because HUD did not deny CPD funds to the County based on the "adoption, continuation or discontinuation" of a zoning ordinance by any municipality, it did not violate either § 12705 or § 12711.[109]

Once a jurisdiction requests CPD funds, HUD may require the jurisdiction to analyze how the zoning laws of its municipalities may impede the overall effort to "affirmatively further fair housing." To the extent that the analysis identifies such laws as impediments to fair housing, HUD may also require that the jurisdiction develop a

---

[109] The Government also argues that "Section 12705 restricts HUD's consideration of zoning policies that affect the *cost* or *affordability* of housing, but that HUD's concern in this case was whether zoning affects *fair* housing—that is, whether those policies had a segregative effect." Gov. Br. 21 (emphases supplied). In short, the Government's argument is that HUD did not violate § 12705, because it did not consider how Westchester's zoning laws affected "affordable" housing, only how they affected "fair" housing. It is apparent, however, that "affordable" housing and "fair" housing are frequently related concepts—or, to put the point another way, that a lack of "affordable" housing in a given jurisdiction may "disparately impact" racial minorities. In any event, because we conclude for other reasons that HUD's actions did not violate §§ 12705 and 12711, we need not address this alternative argument.

46

strategy to "overcome the effects of [those] impediments."[110] Had the County undertaken an adequate analysis of impediments to fair housing that identified certain zoning ordinances as problematic, the County may well have been able to design a strategy to overcome the negative *effects* of those ordinances short of seeking full repeal, though we need not decide the point here. In any event, it is well settled that Congress may "further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives."[111] And "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds."[112] As the Supreme Court stated in a different context, "the receipt of federal funds . . . is a consensual matter: the . . . grantee weighs the benefits and burdens before accepting the funds and agreeing to comply with the conditions attached to their receipt."[113]

Here, Congress has charged HUD with using its grant programs to eradicate practices—such as exclusionary zoning—that are contrary to the advancement of what its governing statutes and

---

[110] *See* 24 C.F.R. § 91.225(a)(1) (requiring, as part of the obligation to affirmatively further fair housing, that jurisdictions identify "appropriate actions to overcome impediments identified" in the AI).

[111] *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (internal quotation marks omitted).

[112] *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2328 (2013).

[113] *Guardians Ass'n v. Civil Service Comm'n*, 463 U.S. 582, 596 (1983) (plurality).

regulations define as "fair housing."[114] As a condition for the distribution of millions of dollars in CPD funds, HUD required the County to analyze whether the zoning laws in some of its municipalities were exclusionary and, if so, to develop a plan to encourage these municipalities to change their laws. When the County did not comply to HUD's satisfaction, HUD withheld the County's funding. We agree with the District Court that this decision did not violate either § 12705 or § 12711.

In urging otherwise, the County argues that HUD was required to approve its AI because it was "substantially complete." Under § 12705(c)(1), HUD must approve an otherwise acceptable housing strategy within 60 days of receipt so long as it is "substantially complete." However, HUD has the authority to "disapprove a plan or a portion of a plan if it is . . . substantially incomplete," and an example of such a plan is one "for which a certification is rejected by HUD as inaccurate, after HUD has inspected the evidence and provided due notice and opportunity to the jurisdiction for comment."[115] Because we agree with the District Court that HUD had sufficient grounds to conclude that the

---

[114] *See* 42 U.S.C. § 3608(e)(5) (requiring HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [the FHA]"); *see also Inclusive Communities*, 135 S. Ct. at 2521-22 (noting that discriminatory practices under the FHA "include zoning laws . . . that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification").

[115] 24 C.F.R. § 91.500(b) (emphasis supplied).

County's housing strategy was substantially incomplete, we reject the County's claim that HUD violated § 12705(c)(1) in this regard.

Nor are we persuaded by the County's argument that the four so-called "Special Assurances" HUD requested from the County in its August 9, 2013 and July 18, 2014 letters violated §12705 or § 12711.[116] While these requested promises did include commitments (1) to adopt the monitor's conclusions that certain municipalities had exclusionary zoning ordinances, and (2) to seek removal of those ordinances, including through litigation if necessary, the County's refusal to satisfy the Special Assurances was not the basis for HUD's withholding of CPD funds. Rather, HUD had *already* denied the County's grant applications based on the inadequate analysis discussed above and was facing imminent deadlines to reallocate the funds at issue before the relevant appropriations expired. Thus, to assist the County in meeting application requirements before these hard deadlines, HUD stated that if the County agreed to the Special Assurances, HUD would approve the County's application. We do not understand HUD to have *required* the Special Assurances as a necessary condition of obtaining CPD funds. Rather, HUD offered the Special Assurances as a possible avenue by which the County could satisfy the grant requirements. Thus, because HUD does not appear to have conditioned the County's CPD funds on the County's agreement to the Special Assurances, we conclude that HUD did not violate § 12705 or § 12711 by proposing them. We need

---

[116] J.A. 259-65 & 74, respectively.

not address the counterfactual question of whether HUD would have violated those statutory provisions if it had conditioned the County's CPD funds on these assurances.

Accordingly, we affirm the District Court's judgment insofar as it dismissed the County's claim that HUD's action violated § 12705 and § 12711.

## CONCLUSION

This case resolves a narrow question: May HUD require a jurisdiction that applies for CPD funding to analyze whether local zoning laws will impede the jurisdiction's mandate to "affirmatively further fair housing"? Because HUD may impose such a requirement on jurisdictions that apply for CPD funds, and because the decision to withhold Westchester County's CPD funds in this case was not arbitrary or capricious, we conclude that HUD's action complied with federal law.

It bears emphasizing that this decision does *not* mean that any of Westchester County's municipalities violated the Fair Housing Act or engaged in discrimination on the basis of race. We merely conclude that HUD's decision—in the context of providing federal funds—to require the County to redo its zoning analysis and to develop strategies to overcome impediments to fair housing did not violate federal law. In short, there has been no finding, at any point, that Westchester actually engaged in housing discrimination.

As a consequence of this decision, HUD is authorized to reallocate Westchester's CPD funds for FY 2013 and, eventually, for FY 2014, and to continue withholding the roughly $750,000 in funds remaining for FY 2011. As noted above, the County has indicated that it will no longer seek CPD funds for FY 2015 to FY 2017. In response to an Order we issued on August 28, 2015, the Government stated that the County's decision not to apply for future funds does not affect any continuing obligations under the consent decree, including the requirement that the County submit an AI deemed acceptable by HUD.[117] We leave for future litigation the question of how HUD can enforce the consent decree against the County, now that the County no longer plans to seek additional federal funds. We also leave it to the district court in a future case to consider what steps the County can or must take to end further supervision over its housing policies, pursuant to this consent decree. In so doing, the district court should be mindful of the teaching of the Supreme Court that courts should apply a "flexible standard" to deciding whether "a significant change in facts or law warrants revision of [a consent] decree,"[118] as well as our recent observation in another

---

[117] *See* Gov. Br. 56-59.

[118] *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 393 (1992). As the Supreme Court more recently held, a district court

> must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials. As public servants, the officials of the State must be presumed to have a high degree of competence in deciding how best to discharge their governmental responsibilities. A State, in

context that "[a]t some point in time this litigation has to be ended."[119]

\* \* \*

In sum, we **AFFIRM** the District Court's judgment of July 21, 2015, and **VACATE IN PART** the temporary injunction issued *pendente lite* by a motions panel of this Court on May 1, 2015.

HUD is authorized to reallocate the County's FY 2013 funds forthwith. As to the County's FY 2014 funds, however, HUD is directed to delay reallocating those funds until after the County exhausts its right to seek further review of this decision.

---

the ordinary course, depends upon successor officials, both appointed and elected, to bring new insights and solutions to problems of allocating revenues and resources. The basic obligations of federal law may remain the same, but the precise manner of their discharge may not. If the State establishes reason to modify the decree, the court should make the necessary changes; where it has not done so, however, the decree should be enforced according to its terms.

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004).

[119] *Bridgeport Guardians, Inc. v. Delmonte*, 602 F.3d 469, 476 (2d Cir. 2010); *see also id.* ("Except in highly unusual circumstances, it is the business of cities, not federal courts or special masters, to run police departments.").